IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 MAY 10 P 3: 59

CLERK _____

SO. DIST. OF GA.

DESIRE NORTHINGTON,            *
                              *
        Plaintiff,            *
                              *
    v.                        *        CV 111-014
                              *
DREAMLAND AMUSEMENTS, INC.,   *
                              *
        Defendant.            *

―――――――――
**O R D E R**
―――――――――

Presently pending before the Court is Defendant's Motion for Summary Judgment.  (Doc. no. 38.)  For the reasons set forth below, Defendant's motion is **GRANTED**.

## I. <u>BACKGROUND</u>

### A.   **The Accident**

This case arises from injuries Plaintiff sustained on October 26, 2006, at the Georgia-Carolina State Fair in Augusta, Georgia.  (Compl. ¶ 17.)  While riding the "Orbiter," an amusement ride owned by Defendant, Plaintiff was ejected from her gondola and thrown approximately sixty feet in the air.  (Ex. 1 at 4.)   Plaintiff landed on the base of a nearby ride.  (<u>Id.</u>)  As a result of being thrown from the Orbiter, Plaintiff suffered a severe closed head injury.  (Compl. ¶ 11.) She was hospitalized in the intensive care unit at the Medical

College of Georgia and placed in a medically induced coma. (Id.) She subsequently underwent rehabilitation at the Walton Rehabilitation Center. (Northington Dep. at 57.)

Before the Georgia-Carolina State Fair officially opened to the public, the Georgia Department of Labor ("GDOL") determined that the Orbiter was safe and cleared it for operation. (Rosales Dep. at 41-42.) The Orbiter was also inspected by Defendant's employees every morning and periodically throughout the day. (Id. at 18, 41-42.) These inspections were performed on the day Plaintiff was injured. (Id. at 41-42.)

Ricardo Rosales and George Neider operated the Orbiter on the day of the accident. Rosales testified to his and Neider's actions during the operation of the ride cycle that injured Plaintiff. According to Rosales, once the passengers were seated, he engaged the ride's lap bar restraint system and secured it so that passengers could not unlatch the lap bar. (Id. at 42-43, 45-48.) He also engaged the ride's secondary restraint, which is a chain attached to the lap bar that locks the bar into the engaged position. (Id. at 46-48.) Rosales instructed the passengers to keep their hands and feet inside the Orbiter while it was in motion. (Id. at 47.) Neider then double-checked both the primary and secondary restraints on

each of the gondolas, confirming that they were both properly secured. (Id. at 48.)

According to Rosales, after securing the passengers, he positioned himself at the main control station, known as the "dog box," which was at the left-hand side of the ride. (Id. at 21.)  In the dog box, Rosales activated the "Hercules switch," a foot pedal that must remain depressed in order to keep the Orbiter in motion. (Id. at 39-40, 21-22, 49.) Neider was positioned at "the pole" on the right-hand side of the ride. (Id. at 40.) Emergency stop buttons were located at both the dog box and the pole. (Id.) Rosales then placed the Orbiter into slow speed which enabled him and Neider to visually inspect it and ensure that the passengers had not tampered with the restraints. (Id. at 26.)

Shortly after the ride began moving, Rosales noticed Plaintiff's legs hanging out of her gondola. (Id. at 31, 50.) The girl seated next to Plaintiff was holding onto Plaintiff's jacket in an attempt to keep her in the gondola. (Ex. 1 at 5.) Upon seeing Plaintiff, Rosales and Neider hit the emergency stop buttons at their respective stations. However, by the time the Orbiter came to a stop, Plaintiff had already been ejected. (Rosales Dep. at 50.)

3

**B.   The Investigations**

Following the accident, the GDOL and the Georgia Bureau of Investigation ("GBI") arrived at the fair to perform an investigation and reevaluate the Orbiter's safety.   After interviewing witnesses, consulting with police officers, and inspecting the ride firsthand, GDOL Safety Inspector Carl Spitzer ("Inspector Spitzer") prepared an official accident investigation report, as well as a new inspection report recommending that the GDOL "release [the] ride for operation." (Ex. 1 at 15.)   Based on the statements of Rosales and Neider, Inspector Spitzer concluded: (1) the ride was operating properly at the time of the accident, and (2) Neider activated the emergency stop button as soon as he saw Plaintiff's legs coming out of the foot-well of the gondola.   (Id. at 3-5.) Upon concluding that the Orbiter was functioning properly and that Defendant's employees acted reasonably, Inspector Spitzer opined that Plaintiff had panicked and attempted to exit the Orbiter while it was in motion.   (Id. at 5)

At the request of Daniel J. Craig, District Attorney ("DA") for the Augusta Judicial Circuit, the GBI began its own investigation of the underlying incident.   On November 5, 2006, GBI Special Agent Kicklighter and DA Craig travelled to Delco, North Carolina, to observe the Orbiter in its storage facility. (Id. at 57-70.)   They took photographs of the ride but could

4

not properly inspect it because trained professionals were not present to set it up. (Id. at 61-62.)

DA Craig, the GBI, and the GDOL agreed that it would be beneficial to retain an independent expert to conduct a separate investigation to determine the operational accuracy, safety, and readiness of the Orbiter. (Id. at 25.)  They selected David Collins, an electrical engineer widely recognized as an expert in the field of amusement ride design and operations. (Id.)

On November 17, 2006, Mr. Collins, along with DA Craig, GBI Agent Kicklighter, and GDOL officials, traveled back to North Carolina to inspect and test the Orbiter.  Upon observing Defendant's employees set up the Orbiter, observing the ride in operation, and testing its systems, Mr. Collins concluded that the Orbiter had been properly maintained and was functioning normally at the time of Plaintiff's accident. (Id. at 25-28.) In conducting his inspection, Mr. Collins tested the electrical and hydraulic systems of the ride and concluded that the Orbiter was in good working order and had not been tampered with or modified. (Id. at 29.)  Mr. Collins also determined that the lap bar restraint system in the Orbiter was functioning properly. (Id.)

Mr. Collins performed testing to determine the effect of the "accelerations" or G-forces that Plaintiff was subjected to

while seated in the Orbiter. These measurements confirmed "that a rider seated upright with there [sic] feet in the foot tub and hands at there [sic] side or on the closed and latched lap bar would not be ejected from the [Orbiter]." (Ex. 2B at 20.) Had Plaintiff "remained properly seated," she "would not have been ejected." (Id.) Mr. Collins likewise concluded that the Orbiter's lap bar restraint system was in compliance with the current American Society for Testing and Materials ("ASTM") standards governing amusement ride restraint systems. (Id.)

Mr. Collins also determined that an unrestrained but seated rider would not have been ejected from the Orbiter. (Id. 17-20.) To demonstrate, he placed an open-top can filled with water on the seat of the gondola and sent the ride through a cycle. (Id. at 13.) The unrestrained can remained upright throughout the cycle. (Id.)[1]

Upon completion of his investigation, Mr. Collins reached the following conclusions: (1) prior to the accident the ride was mechanically and electrically functioning and carrying riders properly, (2) following the accident the Orbiter was mechanically and electrically functioning and carrying riders properly, (3) the mechanical and electrical design of the Orbiter did not contribute to the accident, (4) the

---

[1] This test mirrored an earlier test performed by the GBI. On November 9, 2006, GBI Agent Kicklighter had performed an experiment whereby he placed buckets of water on the seat of a gondola and initiated a ride cycle. (Ex. 1D at 6.) The buckets remained upright on the seat throughout the cycle, and no water was dispersed from them. (Id.)

"accelerations" or G-forces of the Orbiter were within acceptable engineering tolerances, (5) the Orbiter's Patron Restraint System was in compliance with the industry standard for patron containment, (6) the measurements of the "accelerations" or G-forces established that a "properly seated patron" would not be ejected from the ride, (7) Defendant properly maintained the Orbiter in accordance with current ASTM standards, (8) Defendant's employees set-up the Orbiter in accordance with the procedures in the operations manual, and the set-up did not contribute to the accident, (9) at the time of the accident, Defendant's staff was operating the ride in accordance with the procedures in the operations manual and governing ASTM standards, (10) Defendant's employees operated the ride in a manner that did not contribute to the accident, and (11) Plaintiff would not have been ejected from the Orbiter had she remained properly seated. (Id. at 17-20.)

C.  **Procedural History**

On May 12, 2010, Plaintiff filed suit in the Superior Court of Richmond County claiming that Defendant's negligence caused her injuries. (Doc. no. 1, Ex. 1.) The Complaint alleged that Defendant: (1) negligently represented that the operation of the Orbiter would be conducted in a safe manner; (2) negligently misrepresented that the Orbiter was constantly maintained; (3) failed to properly warn patrons of the

dangerous nature of the Orbiter; (4) failed to properly inspect and maintain the Orbiter to ensure that the rotation of the center shaft and occupant pods were properly counterbalanced and operated in such a way that inertial and centrifugal forces safely restrained occupants in their seats; (5) failed to provide additional supplementary restraints; (6) negligently operated the Orbiter; and (7) failed to properly monitor the Orbiter and to properly shut it down with the available emergency stop switch.  (Compl. ¶ 14.)

Defendant subsequently removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.  (Doc. no. 1.)  On October 7, 2011, Defendant moved for summary judgment asserting that there is no evidence that Defendant or its employees acted negligently.  Defendant further claims that Plaintiff both caused the accident and assumed the risk of injury by leaving her seated position in the Orbiter.  (Doc. no. 38 at 11-15.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must view the facts in the light most favorable to the non-moving party, Matsushita, 475 U.S. at 587, and must draw "all justifiable inferences in [its] favor." Four Parcels, 941 F.2d at 1437 (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).  A

mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrate[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 40.)  Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. <u>DISCUSSION</u>

As an initial matter, Defendant moved for summary judgment on all theories of negligence raised in Plaintiff's Complaint. However, in her response to Defendant's motion for summary judgment, Plaintiff only challenges the issue of whether Defendant's employees acted negligently when loading passengers into the Orbiter on the day of the accident.  Therefore, the Court treats the other claims of negligence as abandoned and will only address the question of whether Defendant's employees acted negligently.  <u>Lazzara v. Howard A. Esser, Inc.</u>, 802 F.2d 260, 269 (7th Cir. 1986) (a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned); <u>see also</u> <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995) (grounds alleged in the

complaint but not relied upon in summary judgment are deemed abandoned).[2]

Based on the record before the Court, there is no evidence to support Plaintiff's claim that the negligence of Defendant's employees caused the accident. "Issues of negligence, contributory negligence, assumption of the risk, and lack of ordinary care for one's own safety are not susceptible of summary adjudication." Woolbright v. Six Flags Over Georgia, Inc., 172 Ga. App. 41, 41 (1984) (citing Oglesby v. City of Atlanta, 166 Ga. App. 192, 193 (1983)). However, "where the trial court can accurately conclude upon plain, palpable and indisputable evidence that there was no negligence attributable to the defendant, then it is not improper in such a case to direct summary judgment in favor of the defendant." Id.[3]

Here, the evidence presented establishes that Defendant's employees acted reasonably during the operation of the ride and that Plaintiff would not have been injured had she remained seated in the gondola. Inspector Spitzer and Mr. Collins both concluded that Rosales and Neider operated the Orbiter properly and that Plaintiff panicked and attempted to exit the Orbiter while it was in motion. They also concluded that even if

---

[2]    Even if the Court considered the other allegations of negligence, Defendant would be entitled to summary judgment as Plaintiff has not presented any evidence demonstrating that a question of material fact exists.

[3]    In diversity cases, a federal court applies the law of the forum in which it sits. Continental Cas. Co. v. Adamo, 326 F.3d 1181, 1182 (11th Cir. 2003).

Plaintiff was not properly restrained, she would not have been ejected from the Orbiter had she remained properly seated. There is no evidence suggesting that Defendant's employees should have known that Plaintiff would attempt to exit her seat while the Orbiter was in motion or that they had a reasonable opportunity to prevent Plaintiff's accident.  Thus, there is no evidence supporting Plaintiff's assertion that Defendant's negligence caused the accident.

In opposition to Defendant's motion, Plaintiff relies on the testimony of Rosales to demonstrate that a question of material fact exists in this case.  When asked whether it would be possible for someone to unlock either the primary or secondary restraint system while the Orbiter was in motion, Rosales stated that it was not possible because the G-forces of the ride would cause the passengers to be "pressed against the back seat" making it "impossible to move."  (Id. at 55, 56.) He also stated that "you can [move your hands], but . . .  as soon as you lift them, they're getting pulled back."  (Id.) Plaintiff contends that these statements conflict with Rosales' previous testimony that Plaintiff panicked and attempted to exit the ride.  According to Plaintiff, if the G-forces prevented Plaintiff from moving her arms, she would have been unable to remove the restraints while the ride was in motion. Plaintiff contends that this case should be submitted to a jury

because Rosales contradicted both himself and the other evidence in the record. See Griffin v. Bremen Steel Co., 161 Ga. App. 768, 771 (1982) ("If a witness [is] successfully contradicted as to a material matter, his credit as to the other matters shall also be for the jury.").[4]

Despite Plaintiff's claim to the contrary, Rosales' statement does not contradict his previous testimony or the other evidence in the record. First, Rosales was not qualified as an expert and thus cannot testify as to the effects of the G-forces on the Orbiter's passengers. He did not testify as to any special education, training, or experience in the field of engineering or in the laws of physics. Thus, while the Court is required to consider Rosales' testimony that is based on his personal observations, the Court cannot consider his testimony regarding the G-forces when determining whether a question of fact exists.

Second, even if this Court does consider Rosales' testimony regarding the effects of the G-forces on passengers, there is no material inconsistency in his testimony. When Rosales testified to the effects of the G-forces, he was

_____

[4] Rosales is currently incarcerated in the Camden County Sheriff's Detention Center awaiting trial on the charge of possessing a controlled substance. He also has a prior felony criminal conviction for entering an automobile for which he received five years probation. Plaintiff asserts that she will use these convictions to impeach Rosales at trial. She believes that impeaching Rosales "could lead the jury to discredit [his] testimony that he and . . . Neider assured [Plaintiff] was properly restrained in her seat, and allow a finding that Defendant's employees acted negligently."

discussing the effects on passengers generally, not the effects on *Plaintiff* specifically.    Nowhere in his deposition did Rosales indicate that the G-forces prevented *Plaintiff* from removing or maneuvering under her restraints.    Indeed, he said just the opposite.    He testified that she panicked and was ejected from the ride, which suggests that she had already bypassed the restraints before the G-forces reached full force.

Rosales' testimony is also consistent with the accident report and the findings of Mr. Collins' investigation.    Rosales testified as to the effects of the G-forces while the Orbiter is at *full speed*.    Inspector Spitzer, like Rosales, testified that when the Orbiter "reaches *full speed*, there is a considerable amount of G forces to hold the occupant in the tub." (Ex. 2 at 5) (emphasis added).    However, Rosales stated that he saw Plaintiff in distress as the Orbiter "almost hit full speed." (Rosales Dep. at 31.)    This is consistent with Inspector Spitzer's conclusion that Plaintiff "managed to maneuver herself into a position to attempt going underneath the lap bar *before* the ride reached full speed." (Ex. 2 at 5) (emphasis added).    Therefore, Rosales' statement is consistent with Inspector Spitzer's report.    Both indicated that although the G-forces on the Orbiter can prevent a passenger from removing the lapbar restraints when the ride is operating at

full speed, Plaintiff managed to maneuver out of the restraints *before* the Orbiter reached full speed.

Based on the evidence, there is no question of material fact regarding whether Defendant's employees acted negligently in restraining Plaintiff. The investigative reports, which are unchallenged by Plaintiff, found that the employees acted reasonably and that Plaintiff panicked while the ride was in motion, tried to exit the ride, and was ultimately ejected. The reports also establish that even if Defendant's employees failed to properly restrain Plaintiff, she would not have been ejected had she remained in the seated position. Therefore, Defendant is entitled to summary judgment.

## IV. CONCLUSION

Upon the foregoing, Defendant's Motion for Summary Judgment (Doc. no. 38) is **GRANTED**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendant, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this _10th_ day of May, 2012.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA